**[J-124-2016] [MO:Saylor, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 74 MAP 2016 |
| | : | |
| Appellant | : | Appeal from the Order of the York |
| | : | County Court of Common Pleas, |
| | : | Criminal Division, at No. CP-67-CR- |
| v. | : | 0002400-2014 dated 2-10-2015. |
| | : | |
| | : | ARGUED: December 7, 2016 |
| JOEY WAYNE HERMAN, | : | |
| | : | |
| Appellee | : | |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                                   **DECIDED: May 25, 2017**

I agree with the points adeptly articulated in Justice Donohue's concurring and dissenting opinion. Like Justice Donohue, I concur in the learned Majority's disposition of the issues regarding the classification of PB-22 as an "analogue" of JWH-018, both before and after the Act 40 amendments to the Controlled Substance, Drug, Device and Cosmetic Act, 35 P.S. §§ 780-101, *et seq.* I depart from the Majority at the same juncture as Justice Donohue, in that I conclude that the definition of a "designer drug"[1] suffers from the same constitutional infirmity as the "analogue" provision, 35 P.S. § 780-104(1)(vii), as applied to PB-22. Accordingly, I respectfully dissent.

---

[1]    *See* 35 P.S. § 780-102(b) (defining "designer drug," in relevant part, as "a substance other than a controlled substance that is intended for human consumption and that either has a chemical structure substantially similar to that of a controlled substance in Schedules I, II or III of this act or that produces an effect substantially similar to that of a controlled substance in Schedules I, II or III"). As the Majority notes, the Commonwealth concedes that the "effect" of PB-22 on the body is unknown, so we here are concerned only with its "chemical structure." Maj. Op. at 4-5 n.8, 11 n.14, 16.

As Justice Donohue highlights, the expert testimony presented in this case revealed a significant problem: the scientific community recognizes no accepted standard or methodology for determining whether two substances are "analogues" or whether their chemical structures are "substantially similar" to each other. The inability to discern an intelligible or predictable standard for applying these concepts strikes the same constitutional blow to the definition of a designer drug that the Majority deems fatal to the analogue provision. I join Justice Donohue's opinion, and add the following.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Commonwealth v. Mikulan*, 470 A.2d 1339, 1342 (Pa. 1983) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Even more succinctly, due process requires that a criminal statute must provide "reasonable standards by which a person may gauge his future conduct." *Commonwealth v. Mayfield*, 832 A.2d 418, 422 (Pa. 2003). A statute is unconstitutionally vague if it fails to satisfy either the "fair warning" prong or the "arbitrary or discriminatory enforcement" prong. *See Hill v. Colorado*, 530 U.S. 703, 732 (2000). In my view, as applied to PB-22 during the relevant timeframe,[2] the definition of a designer drug is deficient in both respects.

The Majority concludes that, unlike the statutorily undefined and "somewhat nebulous" concept of a controlled substance analogue, Maj. Op. at 23, the definition of a designer drug is not unconstitutionally vague because, *inter alia*, its operative

---

[2]     As the Majority notes, the definition of a designer drug specifies that "designer drugs and controlled substances . . . are mutually exclusive categories." Maj. Op. at 18 n.17. PB-22 has been added to the schedule of controlled substances. *See* Act of June 8, 2016, P.L. 258, No. 37; Maj. Op. at 20-21, 22 n.20. Therefore, PB-22 is now a controlled substance, not a designer drug. Accordingly, we today consider the definition of a designer drug as it applied to PB-22 before the revision.

language—substantially similar—is not specialized or technical, and "the concept of similarity is well known to persons of ordinary intelligence." *Id.* With that much I certainly agree. However, it is not the statute's call for comparison that places it outside the bounds of ordinary comprehension. It is the *object* of that comparison—chemical structure—that is problematic. We can expect the average citizen to understand common words like "substantial" and "similar." But the law cannot fairly impart upon the general populace a working knowledge of organic chemistry. As the United States Court of Appeals for the Sixth Circuit has noted, "we do not impute specialized knowledge to the 'person of ordinary intelligence' by whom we judge the statute's vagueness." *United States v. Caseer*, 399 F.3d 828, 837 (6th Cir. 2005). To predicate criminal punishment upon the application of such knowledge raises serious due process concerns. Criminal laws apply to everyone. One must not be required to hold a doctorate in chemistry in order to recognize the conduct that is forbidden by those laws.[3]

In support of the contention that an ordinary citizen fairly may be asked to compare the chemical structures of different molecules, on pain of committing a criminal offense, the Majority relies upon *United States v. McKinney*, 79 F.3d 105 (8th Cir. 1996). *See* Maj. Op. at 24. In *McKinney*, the United States Court of Appeals for the Eighth Circuit rejected an argument that the term "substantially similar" in the federal definition of a "controlled substance analogue," 21 U.S.C. § 802(32)(A), is unconstitutionally

---

[3] Moreover, in light of the expert testimony adduced in the instant case, it is clear that, due to the lack of consensus in the scientific community, even possessing a doctorate in a relevant scientific field and dedicating extensive study to the very question at issue is not sufficient to allow one to reach a predictable or consistent conclusion as to whether two chemical structures are "substantially similar." *See* Maj. Op. at 9-10, 23 n.21; Conc. and Diss. Op. at 2-3 (Donohue, J.) (discussing the expert testimony of Michael Coyer, Ph.D., John Huffman, Ph.D., and Heather Harris, Ph.D.).

vague. In doing so, the *McKinney* court set forth the dubious proposition that "a reasonable layperson could . . . have examined a chemical chart and intelligently decided for himself or herself, by comparing their chemical diagrams, whether the chemical structure of two substances were substantially similar." *McKinney*, 79 F.3d at 108. A reproduction of the diagrams of the chemical structures at issue in the instant case demonstrates the troublesome nature of this proposition:



JWH-018 (Scheduled)          PB-22 (JWH-018 Analogue)

Brief for Commonwealth at 14 (reproduced from Report of Dr. Coyer at 6).

JWH-018                    PB-22

Brief for Commonwealth at 15 (reproduced from Report of Dr. Huffman at 2).

Several difficulties with this approach plainly are apparent. First, to conclude that such diagrams fairly apprise an ordinary citizen of the prohibited status of a chemical, one must assume that an ordinary citizen is able to locate, interpret, and understand these diagrams. Surely, the typical packet of "Winter Haze" or "V-8 Air Freshener" is not labeled with an illustration of the chemical structure of PB-22 alongside potentially "similar" controlled substances. Nor are such products sold with a chemistry textbook that may aid a consumer in recognizing the nature of the various atoms, bonds, or functional groups that, together, give the substance its identity. Second, even if the ordinary citizen is presented with these diagrams, and can understand what they represent, there remains no principled standard by which to compare them and to ascertain their substantial similarity. Anyone can observe superficial similarities between two chemical diagrams. Indeed, the above diagrams of PB-22 and JWH-018 contain comparable lines, symbols, and polygonal shapes that make them appear similar at first glance. But does the additional "O" in the diagram of PB-22 make a difference? Does the extra "N" substantially change its structure? Is it significant that the two hexagonal shapes at the end seem to attach to the remainder of the structure in a different place? Absent any accepted metric for comparison, we cannot assume that a citizen's determination that these substances are "substantially similar" is based upon a reasoned analysis of "chemical structure," rather than any number of inapt considerations, such as the total number of atoms in the structure, the prevalence of straight lines compared to angled lines, or each diagram's degree of resemblance to some other object.

From these two-dimensional diagrams of their chemical structures, today's Majority finds "considerable similarities" between PB-22 and JWH-018. Maj. Op. at 27 (quoting *United States v. Klecker*, 348 F.3d 69, 72 (4th Cir. 2003). Respectfully, I cannot

agree that these diagrams provide sufficient information to an ordinary citizen so as to establish "fair warning" that PB-22 is a designer drug, unlawful to possess, manufacture, or distribute. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("Vague laws may trap the innocent by not providing fair warning."); *F.C.C. v. Fox Television Stations, Inc.,* 567 U.S. 239, 132 S. Ct. 2307, 2317 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.").

Because the chemical structure of PB-22 is the dispositive feature with regard to the classification of that substance as a "designer drug" within the relevant time frame, and because that feature patently is beyond the scope of knowledge attributable to a citizen of ordinary intelligence, neither the commonly-understood concept of "similarity" nor the fact that the chemical structures of PB-22 and JWH-018 can be rendered as two-dimensional diagrams adequately cures the definition's indeterminacy. What remains is an overly broad description that lacks clear parameters by which an individual may gauge whether conduct is lawful, and whereby an individual may be guilty of a crime based upon a subjective determination for which there is no ascertainably right or wrong answer. Consequently, the definition of a designer drug is written in "terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application," which "violates the first essential of due process of law." *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) (quoting *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926)).

Not only does the definition of a designer drug fail to provide the general populace with fair warning that PB-22 is a prohibited substance, but its imprecision also runs afoul of another requirement of due process under the void-for-vagueness doctrine. The definition allows for "arbitrary and discriminatory enforcement." *Kolender*,

461 U.S. at 357. The same absence of recognizable standards that leaves an ordinary citizen to guess whether PB-22 falls within the ambit of the definition also transforms the duties of the police officer, the prosecutor, and the judiciary into guesswork. "A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 108-09. The Supreme Court of the United States further has recognized that, although the void-for-vagueness principle focuses upon both fair notice and the potential for arbitrary enforcement, "the more important aspect of vagueness doctrine 'is not actual notice, but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender*, 461 U.S. at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)). Rather than specifically delineating the necessary features of a substance in a manner that provides guidelines to law enforcement and allows for predictable application, the definition of a designer drug leaves the determination of the substance's prohibited status to the untrained discretion of the participants in the criminal justice system.

Like the ordinary citizen, police officers, prosecutors, and judges are not chemists. A prosecuting authority may deem a substance to be "close enough" to a controlled substance in one circumstance, but, because there is no standard for assessing whether that determination is accurate, the identical comparison in another circumstance may result in a conclusion that the substances do not share a "substantially similar" chemical structure. Both conclusions are as reasonable as they are inconsistent. When determining whether a given substance is an actually-scheduled controlled substance, law enforcement or prosecuting authorities may submit that substance to a laboratory, which can return a "yes" or "no" answer as to whether

that substance is prohibited.[4]  By contrast, whether a given substance is a "designer drug" is to be determined by an unprincipled judgment call, which allows for enforcement that is, at best, exceptionally discretionary, and, at worst, arbitrary or discriminatory.

The Majority relies upon the abundance of decisions from other jurisdictions that have held that the term "substantially similar" is not unconstitutionally vague as applied to various substances.  *See* Maj. Op. at 25.  Many of these decisions are lacking in persuasive value.  The Majority cites *United States v. Granberry*, 916 F.2d 1008 (5th Cir. 1990), upon which many federal and state courts rely in rejecting vagueness challenges

---

[4]    The Majority expresses concern that, if the incomprehensibility of the definition of a designer drug to the ordinary citizen renders it unconstitutionally vague, "much of the Act would be invalid because many drugs appearing in the schedules are listed by their chemical formulae or technical descriptions."  Maj. Op. at 28.  The Majority further cautions that "it would be misguided to invalidate substantial portions of our controlled-substance legislation on the basis that compounds subject to regulation or criminalization are described by reference to technical formulae unintelligible to the general public."  *Id.*  But this misses the point.  We are not here confronted with a challenge to any provision that identifies particular substances by their chemical formulae.  Nor can the prospect of future challenges alter our analysis in this case.  Chief Justice John Roberts famously observed that, as an "umpire" of the law, "it's my job to call balls and strikes and not to pitch or bat."  Hearing Before the Senate Judiciary Comm. on the Nomination of The Honorable John G. Roberts, U.S.C.J., to be the Chief Justice of the United States, 109th Cong. (Sept. 12, 2005), http://washingtonpost.com/wp-dyn/content/article/2005/09/13/AR2005091300693.html.  As umpires in our own right, we cannot call a strike as a ball simply because a strike would be the third, or because it could change the outcome of the ballgame.  But let us suppose for a moment that our constitutional analysis should be influenced by a fear of the potential impact upon other statutory provisions, a point I do not concede.  Even so, the available mechanisms for objectively determining whether a given substance is a scheduled drug serve as an important point of distinction from the indeterminate definition of a designer drug.  Unlike the subjective determination of whether two substances share a "substantially similar" chemical structure, for which the statute provides the authorities no guidelines, law enforcement personnel readily can determine through chemical testing whether a given substance is, for example, "N-ethyl-3-piperidyl benzilate."  *See* Maj. Op. at 28.  The statutory provision prohibiting that substance does not suffer from the same absence of specificity that is inherent in the definition of a designer drug.

to the "substantially similar" language, including in a number of the other decisions that the Majority cites. *See*, *e.g.*, *United States v. Turcotte*, 405 F.3d 515, 531-32 (7th Cir. 2005); *United States v. Fisher*, 289 F.3d 1329, 1333-34 (11th Cir. 2002); *State v. Srack*, 314 P.3d 890, 896 (Kan. Ct. App. 2013); *State v. Shalash*, 13 N.E.3d 1202, 1209 (Ohio Ct. App. 2014). However, *Granberry*, itself, applied the following reasoning to the federal definition of a controlled substance analogue:

> Despite Granberry's contention to the contrary, the term "controlled substance analogue" in § 813 is clearly and specifically defined, in terms readily comprehensible to the ordinary reader. It provides adequate notice of what conduct is prohibited. The statute makes plain that drugs which have been chemically designed to be similar to controlled substances, but which are not themselves listed on the controlled substance schedules, will nonetheless be considered as schedule I substances if 1) they are substantially similar chemically to drugs that are on those schedules, 2) if they produce similar effects on the central nervous system as drugs that are on those schedules, or 3) are intended or represented to produce effects similar to those produced by drugs that are on those schedules. There is nothing vague about the statute.

*Granberry*, 916 F.2d at 1010. The entirety of the *Granberry* court's analysis entailed a summary of the statutory definition, and a conclusory assertion that "[t]here is nothing vague" about that definition. *Id.* Other courts may deem this discussion to be sufficient. I am not so persuaded.

In other cases that the Majority cites, the courts relied heavily upon the federal circuit courts' consistent rejection of similar challenges. *See*, *e.g.*, *Turcotte*, 405 F.3d at 531 ("The circuit courts considering this issue have unanimously held that the . . . Analogue Provision is not unconstitutionally vague."); *State v. Alley*, 318 P.3d 962, 973 (Idaho Ct. App. 2014) ("There is broad agreement in the federal circuit courts that the statute is not unconstitutionally vague."); *Srack*, 314 P.3d at 896 ("Other federal Circuit Courts of Appeals have reached a similar conclusion."); *Shalash*, 13 N.E.3d at 1209 (citing *Turcotte* and noting that "every federal circuit court that has addressed this

issue has 'held that the . . . Analogue Provision is not unconstitutionally vague.'"). Although uniformity in the federal circuit courts certainly is worthy of note, I find significant that much of this consensus can be traced to thinly reasoned cases like *Granberry* and *McKinney*. Where, as here, faithful application of due process principles pursuant to the void-for-vagueness doctrine reveals clear deficiencies in a statute, I would not yield to the contrary case law of other jurisdictions, absent persuasive analysis.

The Majority notes that "Appellee has not drawn our attention to any court in any jurisdiction which has held that the substantially-similar descriptor is unconstitutionally vague[.]" Maj. Op. at 25. However, in its discussion of the analogue provision, the Majority relies upon a decision which held precisely that. *See* Maj. Op. at 17 (applying *United States v. Forbes*, 806 F. Supp. 232 (D. Colo. 1992)). The Majority implicitly confines its application of *Forbes* to the term "analogue" only, but the court in *Forbes* held that, "[a]lthough the 'substantially similar' language may be generally susceptible to adequate definition, it runs afoul of the vagueness doctrine when it is applied to . . . the circumstances of this case." *Forbes*, 806 F. Supp. at 237. Of particular salience to the instant case, the *Forbes* court noted that "[t]he scientific community cannot even agree on a methodology to use to determine *structural similarity*." *Id.* (emphasis added). The Majority quotes a portion of this statement to suggest that the absence of recognized standards precluded a determination of "analogue status." Maj. Op. at 17. However, the Majority overlooks the fact that it was the "substantially similar" descriptor that the *Forbes* court found problematic. That descriptor was held to be unconstitutionally vague in *Forbes* based upon precisely the same circumstance that was revealed in the instant case—the scientific community cannot even agree on a methodology for determining whether a substance "has a chemical structure substantially similar to that

of a controlled substance" so as to qualify as a designer drug. 35 P.S. § 780-102(b). *Forbes* certainly supports the Majority's conclusion that the analogue provision is unconstitutionally vague, but it equally supports the same conclusion with regard to the definition of a designer drug.

The Majority's final reason for rejecting the vagueness challenge to the designer drug definition is that "the designer drug provision has an express culpability prerequisite whereby a defendant can only be convicted if the government proves he acted knowingly or intentionally." Maj. Op. at 26. To be sure, the Supreme Court of the United States long has held that "the constitutionality of a vague statutory standard is closely related to whether that standard incorporates a requirement of *mens rea*." *Colautti v. Franklin*, 439 U.S. 379, 395 (1979).

> [T]he requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid. . . . The requirement that the act must be willful or purposeful may not render certain, for all purposes, a statutory definition of the crime which is in some respects uncertain. But it does relieve the statute of the objection that it punishes without warning an offense of which the accused was unaware.

*Id.* at 395 n.13 (quoting *Screws v. United States*, 325 U.S. 91, 101-102 (1945) (plurality)). Today's Majority draws support from the Supreme Court's decision in *McFadden v. United States*, __ U.S. __, 135 S.Ct. 2298 (2015), wherein the Court determined that the scienter element of the statute at issue, which prohibits an individual from *knowingly* manufacturing, distributing, or possessing with intent to distribute a controlled substance analogue, does not require knowledge of the identity of the substance, but does require either (1) knowledge that the substance is controlled, or (2) knowledge of the features of the substance that make it a controlled substance analogue. *Id.* at 2302. The *McFadden* Court also noted that the scienter requirement

"'alleviate[s] vagueness concerns,' 'narrow[s] the scope of the [its] prohibition[,] and limit[s] prosecutorial discretion.'" *Id.* at 2307 (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149-50 (2007) (bracketed material in original)).

Although the relevance of a scienter requirement to the vagueness inquiry is well-settled under the precedents of the Supreme Court of the United States, the Court has been careful not to suggest that the presence of a *mens rea* element is dispositive. Rather, the Supreme Court has stated that a scienter requirement may "mitigate," *City of Chicago v. Morales*, 527 U.S. 41, 110 (1999), "alleviate," *Gonzales*, 550 U.S. at 149, or "ameliorate," *Hill*, 530 U.S. at 732, constitutional vagueness concerns.[5] Even framed as merely a factor to consider when confronting a vagueness challenge, the proposition has not gone uncriticized, because it appears to create tension with the familiar maxim: *ignorantia juris non excusat* ("ignorance of the law excuses not"). Professor Wayne R. LaFave has noted:

> One "knowingly" commits an offense when he knows that his acts will bring about certain results (those defined in the statute in question), and whether he knows that deliberately causing such results is proscribed by statute is immaterial. Because it is knowledge of the consequences of one's actions and not knowledge of the existence or meaning of the criminal law which is relevant, it seems clear that uncertain language in a statute is not clarified by the addition of a scienter element.

1 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 2.3 (2d ed. 2003) (footnotes omitted).

Another commentator has opined:

> "Scienter" has frequently been found a component of the offense created by the statute charged with indefiniteness, and on each occasion the

---

[5] I acknowledge, however, that this Court has expressed the proposition in more categorical terms. *See Commonwealth v. Hendrickson*, 724 A.2d 315, 319 (Pa. 1999) ("[V]agueness challenges fail when a statute has a specific intent requirement because a defendant cannot complain he did not understand the crime where he has been found to have had the specific intent of doing what is prohibited.").

statute has been sustained, in part on the notion that the requirement of guilty knowledge clarified it. Yet it is evident that, unless the Court has been fooling itself in these cases, the "scienter" meant must be some other kind of scienter than that traditionally known to the common law— the knowing performance of an act with intent to bring about that thing, whatever it is, which the statute proscribes, knowledge of the fact that it is so proscribed being immaterial. Such scienter would clarify nothing; a clarificatory "scienter" must envisage not only a knowing what is done but a knowing that what is done is unlawful or, at least, so "wrong" that it is probably unlawful. One difficulty here is that it is uncertain whether the courts which subsequently enforce the statutes which the Court sustains will employ the same brand of "scienter" as the Court; if not, and if "scienter" was essential to the Court's holding, then of course the statute which is constitutional is not being administered and the statute which is being administered is not constitutional. In any event, "scienter" has become a recognized element of the lore of vagueness, and represents at its best, a tool to be designedly used in the service of other ends; at its worst, a port of entry for the ethical predilections of the then sitting Court.

Anthony G. Amsterdam, Note, *The Void-for-Vagueness Doctrine in the Supreme Court*, 109 U. PA. L. REV. 67, 87 n.98 (1960) (citations omitted) (cited in *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 n.14 (1982)).

The Supreme Court, at least on one occasion, has invoked the proposition that a scienter requirement reduces the threat of vagueness particularly as compared to the dangers posed by strict liability offenses, which require no proof of *mens rea* to establish guilt. *See Colautti*, 439 U.S. at 395-97. In *Colautti*, the Court expressed the concept not only through the positive statement that the presence of a scienter requirement mitigates constitutional vagueness concerns, but through the inverse, that "[t]he lack of any scienter requirement exacerbates the uncertainty of the statute." *Id.* at 401. The Court cautioned that, "[b]ecause of the absence of a scienter requirement in the provision . . . the statute is little more than 'a trap for those who act in good faith.'" *Id.* at 395 (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)).

Turning to the instant case, the Majority notes that the designer drug provision prohibits the "*knowing* or *intentional* manufacture, distribution, possession with intent to

distribute, or possession of a designer drug." 35 P.S. § 780-113(a)(36) (emphasis added). The Majority explains that "[s]cienter requirements of this nature help alleviate vagueness concerns, both with regard to the adequacy of notice of the proscribed conduct and as a means of limiting prosecutorial discretion." Maj. Op. at 26 (citations omitted). As discussed above, there is certainly precedential support for this proposition. However, if the scienter provision of 35 P.S. § 780-113(a)(36) helps to rescue the definition of a designer drug from a finding of vagueness, the same logic should apply to 35 P.S. § 780-113(a)(30) as it relates to the term "analogue," which the Majority concludes is unconstitutionally vague.

Admittedly, 35 P.S. § 780-113(a)(30) does not use the same scienter language as its designer drug counterpart,[6] but we never have held that the manufacture, delivery, or possession with intent to deliver a controlled substance is a strict liability offense. Indeed, construing the statute in *Commonwealth v. Rambo*, 412 A.2d 535, 537 (Pa. 1980), we relied upon the definition of "possession" provided by Subsection 301(c)

---

[6]     The crimes are defined, in relevant part, as follows:

(a) The following acts and the causing thereof within the Commonwealth are hereby prohibited:

\*     \*     \*

(30) Except as authorized by this act, the manufacture, delivery, or possession with intent to manufacture or deliver, a controlled substance . . . or knowingly creating, delivering or possessing with intent to deliver, a counterfeit controlled substance.

\*     \*     \*

(36) The knowing or intentional manufacture, distribution, possession with intent to distribute, or possession of a designer drug. . . .

35 P.S. § 780-113(a)(30), (36).

of the Crimes Code, which defines the term as "an act, within the meaning of this section, if the possessor knowingly procured or received the thing possessed or was aware of his control thereof for a sufficient period to have been able to terminate his possession." 18 Pa.C.S. § 301(c). We held that "[s]uch knowledge is required by statute and our case law in order to prove possession of a controlled substance." *Rambo*, 412 A.2d at 537; *accord Commonwealth v. Valette*, 613 A.2d 548, 549-50 (Pa. 1992) ("In drug possession cases, the Commonwealth must prove that a defendant had knowing or intentional possession of a controlled substance . . . ."). Furthermore, Subsection 302(c) of the Crimes Code provides a default scienter requirement where such a term is not otherwise specified by a criminal statute. 18 Pa.C.S. § 302(c) ("When the culpability sufficient to establish a material element of an offense is not prescribed by law, such element is established if a person acts intentionally, knowingly or recklessly with respect thereto."). Accordingly, 35 P.S. § 780-113(a)(30) does not define the manufacture, delivery, or possession with intent to deliver a controlled substance analogue as a strict liability offense—the statute requires proof of scienter. If the scienter requirement of 35 P.S. § 780-113(a)(36) helps to "alleviate vagueness concerns" with regard to the definition of a designer drug, Maj. Op. at 26, the fact that 35 P.S. § 780-113(a)(30) also requires proof of scienter should mitigate the vagueness of the term "analogue" in the same manner.

Ultimately, even if the scienter requirement in the charging statute helps to alleviate concerns about the vagueness of the definition of a designer drug, it does not help enough. At most, the scienter requirement may constitute a "means of limiting prosecutorial discretion," Maj. Op. at 26, in that it makes the elements of the crime more difficult to prove, particularly if it necessitates that a "defendant must know that the chemical he possesses has a molecular structure substantially similar to that of a

scheduled drug." Maj. Op. at 27. Nevertheless, the scienter requirement does not aid in the provision of "fair warning" to the ordinary citizen that a given substance falls within the definition. The statute must allow an individual to gauge the legality of conduct in the first place, and the words "knowing" and "intentional" do not provide the standards that are necessary for the definition to be made amenable to intelligible or consistent application, by either those who are subject to it or those who seek to enforce it. A *mens rea* term is not a Rosetta Stone that enables one to decipher a statute that is inherently indeterminate. The problem remains that "chemical structure substantially similar to that of a controlled substance," 35 P.S. § 780-102(b), is an amorphous and unduly subjective standard, which lies beyond the scope of knowledge attributable to an ordinary citizen, and which cannot be ascertained reliably, even by the most qualified of experts. Terms like "knowing" and "intentional" shed no additional light upon the meaning of that definition. In the words of Justice Anthony Kennedy: "Scienter cannot save so vague a statute as this." *Hill*, 530 U.S. at 774 (Kennedy, J., dissenting).

I recognize that the designer drug statute is a product of the General Assembly's ongoing struggle to prohibit newly-developed and potentially dangerous intoxicants. To be sure, this area of criminal law is in constant flux. I have little doubt that, in some secluded laboratory somewhere, almost immediately after a substance is criminalized, fiendish chemists set to work developing a substance similar in effect, but distinct in identity. Undoubtedly, the designer drug statute targets such substances, even those yet to be invented. I understand that the General Assembly sought to get ahead of these manufacturers, rather than always playing catch-up to ever-changing technology. Still, it is the General Assembly's duty to define the law. Although "we can never expect mathematical certainty from our language," *Grayned*, 408 U.S. at 110, due process requires clarity and specificity in the exercise of the legislative function, particularly in

regard to laws with penal effect. This Court may well be able to discern the purpose underlying an enactment. But it is not our prerogative to fill in the gaps, to improve creatively upon an unduly vague statutory standard, in order to "get us there."

I appreciate the import of the legislative purpose that animates the designer drug statute. I recognize as well the difficulty of drafting language sufficiently tailored to achieve that worthwhile purpose. But importance of purpose and difficulty of drafting do not relieve the General Assembly of its obligation to define criminal offenses in a manner that enables ordinary people to gauge whether their conduct is lawful, and in a fashion that does not encourage arbitrary or discriminatory enforcement. A statute cannot leave the definition of criminality itself to the subjective determination of a police officer, a prosecutor, a judge, or a jury.

Many years ago, Chief Justice Morrison Waite cautioned against the pernicious effect of such a broad grant of legislative authority:

> It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government.

*United States v. Reese*, 92 U.S. 214, 221 (1875). Because 35 P.S. § 780-102(b) defines a designer drug in an impermissibly vague manner, it casts such an overbroad net. Therefore, I agree with the trial court's determination that 35 P.S. § 780-102(b) was unconstitutional as applied to PB-22, and I would affirm the trial court's order in its entirety. I respectfully dissent.

Justices Todd and Donohue join this concurring and dissenting opinion.